**S. J. STILE ASSOCIATES LTD., et al., Appellants,**

v.

**Dennis SNYDER et al., Appellees.**

**Appeal No. 81-9.**

United States Court of Customs and Patent Appeals.

April 2, 1981.

---

Mandel & Grunfeld, New York City, for appellants; Robert B. Silverman, New York City, of counsel.

Thomas S. Martin, Acting Asst. Atty. Gen., Washington, D. C., David M. Cohen, Director, New York City, Joseph I. Liebman, New York City, Atty. in charge, Sidney N. Weiss, New York City, attorneys for appellees.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and NIES, Judges.

MARKEY, Chief Judge.

This interlocutory appeal is from the denial of a preliminary injunction. S. J. Stile Associates Ltd., et al. (Brokers), who have their sole places of business in the immediate vicinity of the Customhouse at J.F.K. Airport, sought to restrain New York Regional Commissioner of Customs Dennis Snyder and his superiors (Commissioner) from discontinuing the practice of permitting a filing of "cross-over" entries in the New York City Customs District. The Court of International Trade, per Judge Boe, denied the Brokers' application for injunctive relief from the bench and subsequently issued a written order to that effect. *S. J. Stile Associates Ltd., et al. v. Snyder, et al.*, 505 F.Supp. 1122, 1123, 2 CIT —— (1981). We affirm.

## Background

The New York City Customs District is coextensive with the New York City Customs Region. The latter is divided into three geographical Areas; *viz.*, J.F.K. Airport (JFK), New York Seaport (Seaport) and Newark. [19 C.F.R. 101.1(a), 101.3(b)] Each Area has a Customhouse located therein for transaction of Customs business.

The term "cross-over" refers to the filing of entry documents, and obtaining release of merchandise, at a Customhouse located in one Area within the District, for merchandise unladen or placed in a bonded warehouse in another Area.

On November 7, 1980, the Commissioner issued "Pipeline 524",[1] to become effective on January 12, 1981. After the effective date, Customs entry documentation, and the resulting release of merchandise from Customs custody, for merchandise unladen or warehoused at Seaport or Newark, could not be filed and obtained at JFK and would have to be filed and obtained at the Customhouse at either Seaport or Newark.[2]

The cross-over entry procedure, described by appellants as in existence for 13 years, has remained in effect to this day throughout the New York Customs District. Although the trial court denied application for a preliminary injunction, appellees agreed, at the suggestion of Judge Boe, to postpone implementation of Pipeline 524 until April 1, 1981, pending decision in this appeal.

The purpose of Pipeline 524 as declared in its text is: "To adjust administrative policy to eliminate many of the errors and delays in entry and liquidation caused by inter-area processing at J.F.K., and to provide more accountable entry service and control of merchandise entered and stored in bonded warehouses."

The Commissioner says Pipeline 524 is one step in a program intended to ameliorate an integrity and management problem, developed over years in the New York Region, in which a dishonest importer might effectively elect the customs officer (import commodity specialist) who would process his documentation.[3]

The Commissioner, having determined that elimination of cross-over filing was essential for effective integrity and management control, directed as a first step its elimination at JFK. Statistical surveys indicated that ninety-seven percent of the brokerage business at JFK would be unaffected by application of Pipeline 524.[4]

The Brokers claim that substantial time delays in filing documents and obtaining

---

1. In general, a "Pipeline" is an information bulletin.

2. The Pipeline does not affect cross-over entries between Seaport and Newark. Entry documents and release for merchandise unladen or warehoused at JFK would have to be filed and obtained at JFK and not at either Seaport or Newark.

3. Extensive investigations into abuses in the New York City Customs Region have resulted in 18 federal prosecutions of customs officials and others.

4. Because cross-over entries between Seaport and Newark constitute 55–60 percent of the business there, the Commissioner says an effort to find an appropriate solution of the Seaport-Newark cross-over problem is continuing.

release of merchandise unladen at Seaport-Newark would not be tolerated by their clients, who would purportedly turn to competing brokers with offices at Seaport-Newark. The Brokers allege an inability to pass on to their customers the increased business expenses incurred in opening offices at Seaport-Newark or in otherwise coping with travel delays between JFK and Seaport-Newark.

Between the issuance of Pipeline 524 on November 7, 1980 and its January 12, 1981 effective date, the Commissioner actively solicited comments on the prospective change in procedure and conducted meetings on at least five occasions with brokers having offices at or near JFK, at which the foregoing objections were asserted and considered. Remaining convinced of the necessity of eliminating cross-over entries at JFK as a first step in solving what was viewed as an integrity and management problem, the Commissioner adhered thereto and the Brokers brought this action below on December 19, 1980.[5]

### Opinion

■ In an interlocutory appeal from a denial of preliminary injunctive relief, the scope of review is narrow. Application for a preliminary injunction is addressed to the discretion of the trial court, not to that of the appellate court. *A-Copy, Inc. v. Michaelson*, 599 F.2d 450, 452 (CA1 1978). One denied a preliminary injunction must meet the heavy burden of establishing an abuse of the trial court's discretion or a clear error of law. *Brown v. Chote*, 411 U.S. 452, 93 S.Ct. 1732, 36 L.Ed.2d 420 (1973); *Fifteen Thousand Eight Hundred*

*and Forty-Four Welfare Recipients v. King*, 610 F.2d 32, 34 (CA1 1979).

■ The trial court must be upheld if it examined the appropriate factors and properly concluded that any one of these requisites for a preliminary injunction had not been established by the appellant: (1) a threat of immediate irreparable harm; (2) that the public interest would be better served by issuing than by denying the injunction; (3) a likelihood of success on the merits; and (4) that the balance of hardship on the parties favored appellant. *Grimard v. Carlston*, 567 F.2d 1171, 1173 (CA1 1978); 11 C. Wright and A. Miller, *Federal Practice and Procedure* § 2948 (1973); *See generally, Developments in the Law—Injunctions*, 78 Harv.L.Rev. 944 (1965).

### Irreparable Harm

■ Only a viable threat of serious harm which cannot be undone authorizes exercise of a court's equitable power to enjoin before the merits are fully determined. *Parks v. Dunlop*, 517 F.2d 785 (CA5 1975). A preliminary injunction will not issue simply to prevent a mere possibility of injury, even where prospective injury is great. A presently existing, actual threat must be shown. 11 C. Wright and A. Miller *Federal Practice and Procedure* § 2948 (1973); *See, State of New York v. Nuclear Regulatory Commission*, 550 F.2d 745 (CA2 1977); *Crowther v. Seaborg*, 415 F.2d 437 (CA10 1969).

■ The Brokers presented general testimony that their business expenses would increase as a result of Pipeline 524. Concerning loss of business, no customer testified that it would transfer its business from any of the Brokers.[6] In essence, the Bro-

---

**5.** The Commissioner testified that Pipeline 524 would be amended to provide free government messenger service between JFK and Seaport-Newark. Hence, even the speculative injuries alleged by the Brokers will be mitigated by virtue of the amendment to Pipeline 524. The Brokers, devoting one-half page in an extended brief (60 pages) to the amended Pipeline, say that the messenger service does not fully eliminate time delays and increased business expenses.

**6.** Brokers' affidavits expressed apprehension and expectation of such transfers. An affidavit described a customer's telephone inquiry on when a new office would be opened. Another affidavit had two customer's letters attached, one inquiring into the matter and the other indicating an intent to seek a broker with a downtown office. The writers of the letters did not testify.

kers invoke the equitable powers of the court to stop an action of the Customs Service on the sole ground that the action would cause some increase in their business expenses. Though the Secretary of the Treasury, and thus the Customs Service, is required to facilitate the commerce of the United States and equal protection of consignees, 19 U.S.C. § 1484(a)(2)(C), nothing in the law requires that the Secretary or the Customs Service insure against an increase of business expenses of customs brokers. Thus solid proof that increased expenses would be certain, had the same been addressed, would not alone justify the injunction sought.[7]

The trial judge noted:

Except for testimony presented that increased costs in business operations would result in the event Pipeline 524 is implemented, minimal and insufficient proof, other than speculations, has been presented that a loss of business or other irreparable damage would result.

Recognizing that implementation of Pipeline 524 could result in increased business expenses, the trial judge determined that the Brokers had not made a showing of irreparable harm sufficient to support the grant of a preliminary injunction. On careful review of the entire record, we cannot say that the trial judge's determination was erroneous. *See, Artmark Chicago Ltd. v. U.S.*, 64 CCPA 116, C.A.D. 1192, 558 F.2d 600 (1977); *Los Angeles Customs and Freight Brokers Assn., Inc. v. Johnson*, 277 F.Supp. 525 (C.D.Cal., 1967).

*Public Interest*

■ As noted in the trial judge's written order, the extent of any possible injury, in the form of increased business expenses, that might occur if the injunction were denied, is paled by the injury that would be done public interest if the injunction were granted. The abuses and irregularities identified in the New York City Customs District reasonably motivated the Commissioner of Customs to order corrective action to preserve the integrity of the Customs Service. The Brokers offered no evidence tending to minimize the threats of corruption and inefficiency which formed the basis for the issuance of Pipeline 524. The argument that the cross-over procedure itself "does not create corruption," ignores the more relevant question of whether continuance of the cross-over procedure may foster or allow corruption or irregularities.

■ In view of the speculative nature of the proof of alleged irreparable harm, this court is not inclined to substitute its judgment of a preferred corrective action for that chosen by the designated executive branch representative having primary responsibility for dealing with the problem entrusted to him. *FTC v. Cement Institute*, 333 U.S. 683, 726, 68 S.Ct. 793, 815, 92 L.Ed.2d 1010 (1948); *Jacob Siegel Co. v. FTC*, 327 U.S. 608, 611–613, 66 S.Ct. 758, 759–760, 90 L.Ed. 888 (1946); *City of Grand Rapids v. Richardson*, 429 F.Supp. 1087 (W.D.Mich.1977).[8]

We therefore find no error in the trial court's determination that there exists a preponderant public interest in implementing the procedures outlined in Pipeline 524.

**7.** It was conceded at oral argument that the Secretary of the Treasury has authority to close down the Customhouse at JFK altogether, and that brokers doing business at JFK would have no legal basis for an injunction against his doing so, there being no vested or constitutional right in the continued operation of any particular location of customhouses, or in a particular organization of customs regions and districts.

**8.** In view of our holding, we need not address in detail other points raised by the parties on appeal regarding the likelihood of success on the merits or the balance of hardship. *A. O.*

*Smith Corp. v. F.T.C.*, 530 F.2d 515 (CA3 1976). Whether issuance of Pipeline 524 is a result of rulemaking, for example, is mooted by appellants' actual notice (5 U.S.C. § 553(b)) and opportunity to participate in the meetings held between November 10, 1980 and January 13, 1981. *Arlington Oil Mills, Inc. v. Knebel*, 543 F.2d 1092 (CA5 1976), *reh. den.* 545 F.2d 168 (CA5 1976); *Florida Citrus Commission v. U.S.*, 144 F.Supp. 517 (N.D.Fla.1956), aff'd 352 U.S. 1021, 77 S.Ct. 589, 1 L.Ed.2d 595 (1957). No evidence was introduced that any interested party was not given notice or afforded a full and fair opportunity to participate in the consideration of Pipeline 524.

Accordingly, we affirm the decision denying a preliminary injunction and remand the case for possible trial on the merits.[9]

*AFFIRMED.*

---

**9.** It is a decision we affirm, not every word spoken by the decision-maker below. The trial judge's indication from the bench that trial on the merits was unlikely cannot, absent a successful motion to dismiss, deprive appellants of their right to a trial of any triable issue remaining.