NATIONAL HAND TOOL CORP., PLAINTIFF *v.*
UNITED STATES, ET AL., DEFENDANT

Court No. 89–11–00636

(Dated February 9, 1990)

*Skadden, Arps, Slate, Meagher & Flom* (*Rodney O. Thorson*), for plaintiff.
*Stuart M. Gerson,* Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Commercial Litigation Branch (*Barbara M. Epstein*), for defendant.

RE, *Chief Judge:* In this action, plaintiff, National Hand Tool Corporation, moves to enjoin the defendant, through its agent, the United States Customs Service, from enforcing redelivery-marking notices that bar entry to certain steel forgings imported from Taiwan. The Customs Service, pursuant to Customs Regulation 134.3, issued the notices and barred entry because the steel forgings had not been marked with their country of origin. Plaintiff contends that, because the imported steel forgings undergo a "substantial transformation" through further manufacture, after importation into the United States, pursuant to Customs Regulation 134.35 they are exempt from country of origin marking requirements.

The imported merchandise entered between August 28 and October 2, 1989, at the port of Dallas/Fort Worth, Texas, as parts of five entries. In each entry, pursuant to Customs Regulation 134.3(b), Customs issued redelivery-marking notices for certain sizes or styles of steel forgings. Plaintiff protested the notices, contending that "[t]he articles in question are unfinished producer goods that undergo further significant manufacturing operations by [plaintiff] in the United States which effect a substantial transformation as that term has been defined by the numerous governing court decisions." On October 20, 1989, the protest was denied.

Contesting Customs' denial of its protest, on November 27, 1989, plaintiff filed this civil action, and moved for a preliminary injunction. Plaintiff sought to enjoin defendant, through its agent, the United States Customs Service, from excluding from entry the steel forgings described in the redelivery-marking notices.

### BACKGROUND

Plaintiff, a manufacturer of mechanics hand tools, is a wholly owned subsidiary of The Stanley Works. In support of its motion for a prelimi-

nary injunction, plaintiff submitted the affidavits of Mr. Thomas E. Mahoney, its president and general manager, and Mr. Anthony R. Pagano, chief metallurgist for The Stanley Works. In addition to the affidavits, plaintiff submitted exemplars of the sizes or styles of steel forgings barred from entry and described in the redelivery-marking notices. At oral argument, counsel for the parties ably presented the issues and their respective contentions.

In his affidavit, Mr. Mahoney stated that plaintiff manufactures "sockets and other components for socket sets." He stated that "[m]ost of the components for these sets are made entirely from scratch beginning with coils of steel rod as feedstock." According to Mr. Mahoney, "some of the lower volume sockets and components are imported as forgings from * * * Taiwan."

Mr. Mahoney stated that since "May 1988, a team of Customs agents and auditors [have conducted] a dragnet investigation of [plaintiff], examining all of its activities both before and after its acquisition by Stanley [in 1986]." He added that, as part of this investigation, between August 24, 1989, and September 14, 1989, Customs issued redelivery-marking notices for "nine different articles that [plaintiff] had been routinely importing and manufactur[ing] into components for socket sets."

Mr. Mahoney stated that:

> [t]he articles in question represented a very small percentage of the total shipments and were in separate containers that could readily be segregated. However, the local Customs officials regularly delayed the release of any of the goods holding them for personal inspection by a particular agent, even after the marking notices were issued. Some of the shipments were released only after [plaintiff] complained about the improper withholding of the merchandise. The delays in receiving these items, which included packing materials and tooling critical to [plaintiff]'s operations, were disruptive and caused the company to modify and make departures from its optimum production and shipping schedules.

According to Mr. Mahoney, Customs' seizure and refusal to permit entry of the imported steel forgings "is causing considerable hardship to [plaintiff]." He explained that:

> [i]t has created a tremendous amount of confusion among personnel * * *. The harm to the company is immediate in terms of the diversion of management time and energy and having a disruptive effect on production schedules and inventory control and threatens [plaintiff]'s ability to make and meet contractual commitments to customers. [Plaintiff] not only faces serious danger of impairment of relations with customers, but is placed in a severely disadvantaged position in a highly competitive market.

Mr. Mahoney added that plaintiff's "tools are sold mostly in sets * * *." Hence, according to Mr. Mahoney, although the total value of the imported steel forgings is $34,273, "the sales value of the socket sets that would be made up with the articles in question would be approximately $1.2 million."

In his affidavit, Mr. Pagano described the manufacturing operations performed on the steel forgings after importation. He stated that he was "personally familiar with the manufacturing process employed at [plaintiff's factory] and the numerous steps in the production of finished tools * * *."

Mr. Pagano stated that steel forgings represent "an intermediate stage in the process of manufacturing a tool, [where] the individual articles will have acquired the shape and the approximate dimensions of what ultimately will be required." He explained that the forgings are "soft and weak and, if employed as a tool, would quickly fail by either breaking of simply losing its shape and dimensional tolerances."

Mr. Pagano noted that, after the forgings are made, "[t]he operations that are generally accomplished next in the production of tools are hardening and tempering, two operations that are sometimes collectively referred to as 'heat treating.' " He explained that:

> [s]tep 1 of the hardening process involves uniformly heating the parts to approximately 1600° F., a temperature which is maintained for approximately 50 minutes. This heating process must be controlled by specialized equipment in which the parts are protected from carbon loss and scaling by the presence of specially prepared protective atmosphere.

Mr. Pagano stated that, after heating, the "succeeding step requires that the parts be quickly cooled or 'quenched' to near room temperature by plunging them in special oils, again at controlled temperatures." He also stated that "[t]he combination of these two steps has served to transform the steel from its original soft malleable state into an entirely different material." Mr. Pagano explained that these processes change the molecular structure of the articles, and produce "a small but significant dimensional change * * *."

Mr. Pagano noted that the next operation, "tempering," improves "[t]he toughness and ability of the tool to withstand deformation * * *." Mr. Pagano stated that the tempering process "consists of a second heating operation which is closely controlled with regard to temperature[,] [and] requires specially designed furnaces that carefully circulate the heating air around the parts in process."

Mr. Pagano noted that, after tempering, "the article is physically capable of performing as a mechanics tool * * *." He stated, however, that "surface protection" is necessary to protect the article from corrosion and rust. Mr. Pagano explained that, in surface protection, "the parts are finish polished to a smooth, bright luster[,] [and] [t]hen they are plated, by electrodepositing * * * a layer of nickel and * * * a layer of chromium on all exposed tool surfaces."

In opposition to plaintiff's motion, defendant presents the affidavit of Mr. John H. Doak, the vice president of business development of Easco Hand Tools, Inc., a manufacturer and seller of mechanics hand tools, and a competitor of plaintiff. Mr. Doak, who had been employed by Easco for thirteen years, stated that he was "familiar with the processes

used in facilities in Taiwan and in the United States * * * to produce hand tools."

Mr. Doak stated that "[t]he single most significant process in the manufacture of sockets and wrenches, in my opinion, is the forming process, where by forging, cold forming, or similar metal-forming processes a bar, slug, or coil of steel (the raw material) is transformed into a shape resembling and in many cases approximating the finished component." He also stated that "the second most significant phase in the manufacture of sockets and wrenches is machining, which usually encompasses a number of separate operations such as turning, drilling, grinding, and broaching; these operations collectively provide the fit, form and near-final dimensions of the finished tool." He stated that "[t]he remaining processes normally are heat treating, surface finishing, plating, and/or assembly where required; these latter operations are minor in comparison to the forming and machining operations that transform the raw material into the basic component of the tool."

Mr. Doak stated that he had examined the exemplars of the imported steel forgings and that:

> [t]he samples of merchandise submitted by [plaintiff] have had numerous forming and machining processes performed upon them prior to importation, which have transformed them from a bar, slug or coil of metal into clearly recognizable components of specific hand tools. The samples have all been formed (forged, friction-welded, turned, or cold-formed) and all machining operations appear to have been completed. With the exception of [one of the exemplars], which has yet to be bent to its final configuration, *only the finishing operations of heat treat, surface finishing, plating and assembly remain to be done.*

(emphasis added). Mr. Doak stated that "[w]ith respect to all the samples submitted, * * * the forming and machining operations performed to manufacture the components in their condition as imported are, as a group, considerably more complex than those required for the heat treating, finishing, and assembly operations after importation."

In his affidavit, Mr. Doak determined, from a review of plaintiff's affidavits and exemplars, "that all of the imported samples in this case have been substantially transformed in Taiwan from bars, slugs, or coils of steel into their condition as imported, in which they are readily recognizable as components of flex handles, speeder wrenches, flex sockets and universal joints." He concluded "that the heat treating, finishing, and assembly operations performed after importation do not substantially transform these components into other articles and are minor in comparison to the forming and machining operations completed prior to importation."

## DISCUSSION

In ruling on a motion for a preliminary injunction, the court must consider:

> (1) the threat of immediate and irreparable harm to the movant;

(2) the movant's likelihood of success on the merits;
(3) the public interest in the grant or denial of the injunction; and
(4) the "balance of hardship" on the parties.

*See Ceramica Regiomontana, S.A.* v. *United States,* 7 CIT 390, 394, 590 F. Supp. 1260, 1263 (1984). *See also Zenith Radio Corp.* v. *United States,* 710 F.2d 806, 809 (Fed. Cir. 1983); *S.J. Stile Assocs. Ltd.* v. *Snyder,* 68 CCPA 27, 30, C.A.D. 1261, 646 F.2d 522, 525 (1981).

In considering these factors, this court uses "a flexible approach which emphasizes a 'balance of the hardships,' which does not require the moving party to sustain a high burden of proof as to each of the four factors enumerated." *Ceramica Regiomontana,* 7 CIT at 394, 590 F. Supp. at 1264 (citing *American Air Parcel Forwarding Co.* v. *United States,* 1 CIT 293, 298, 515 F. Supp. 47, 52 (1981)). In addition, case law teaches that "[t]he critical question * * * is whether denial of the requested relief will expose the applicant to irreparable harm." *PPG Indus., Inc.* v. *United States,* 11 CIT 5, 6 (1987). *See also Timken Co* v. *United States,* 11 CIT 504, 506, 666 F. Supp. 1558, 1559 (1987); *American Air Parcel,* 1 CIT at 299–300, 515 F. Supp. at 53. Hence, "the showing of likelihood of success on the merits is in inverse proportion to the severity of the injury the moving party will sustain without injunctive relief, i.e., the greater the hardship the lesser the showing." *American Air Parcel,* 1 CIT at 300, 515 F. Supp. at 53. *See also PPG Indus.,* 11 CIT at 6; *United States Steel Corp.* v. *United States,* 9 CIT 333, 336, 614 F. Supp. 1241, 1244 (1985).

In support of its assertion that Customs' denial of entry for the imported steel forgings threatens it with immediate and irreparable harm, plaintiff relies on the affidavit of Mr. Mahoney. In his affidavit, Mr. Mahoney asserts generally that Customs' actions cause delays in plaintiff's production schedule, and threaten plaintiff's ability to fulfill contracts with its customers.

Defendant contends that plaintiff "has not established that the harm in this case is 'irreparable,' or in fact, any more injurious than in any other ordinary 'exclusion' case." Defendant notes that plaintiff "has not asserted any specific or tangible instances of an immediate threat of actual harm, or business loss resulting from a failure to make delivery." According to defendant, plaintiff's claimed injury "is merely the obvious and expected disruptions which might affect a company which refuses to mark its goods in compliance with the marking laws, and thereby has its unmarked merchandise excluded."

In *American Inst. for Imported Steel, Inc.* v. *United States,* 8 CIT 314, 600 F. Supp. 204 (1984) (hereinafter *American Institute*), the plaintiffs moved for a preliminary injunction to enjoin the government from denying entry, pursuant to section 805(b) of the Trade and Tariff Act of 1984, of steel pipe and tube imported from the European Community and its member states. In support of its motion, plaintiffs asserted "that they will be liable for various wharfage, handling and storage expenses they would not have incurred but for the embargo." Id. at 318, 600 F. Supp. at

208. This court, however, noted "that an increase in business expenses alone is not irreparable injury." *Id.* (citing *S.J. Stile Assocs. Ltd.,* 68 CCPA at 30, 646 F.2d at 525–26).

In further support of their motion, the plaintiffs in *American Institute* contended "that delay caused by the embargo may result in cancellation of existing contracts and damage their reputation as reliable suppliers." *Id.* at 318, 600 F. Supp. at 209. This court stated that:

> [t]he plaintiffs have produced no evidence that these additional injuries would occur. They have made no showing that delays of less than a month would violate the terms of any contract. They have made no showing that time is of the essence in any contract. They have not shown that they could not substitute other steel products either from their own inventories or from other sources and thereby eliminate potential customer dissatisfaction.

*Id.* The court determined that "[w]here irreparable injury is not demonstrated by 'probative evidence' a preliminary injunction should be denied." *Id.* Accordingly, in *American Institute,* plaintiffs' motion for a preliminary injunction was denied. *See id.* at 322, 600 F. Supp. at 212.

In this case, plaintiff's allegations of harm or injury to customer relationships are neither supported by probative evidence, nor has plaintiff provided any documentary evidence of its contracts. Indeed, plaintiff has submitted no evidence, aside from the affidavit of its president and general manager, Mr. Mahoney, "that delays * * * would violate the terms of any contract[,] [or] * * * that time is of the essence in any contract." *American Institute,* 8 CIT at 318, 600 F. Supp at 209. It was also clear at oral argument that the harm to which plaintiff is subjected is the usual harm of a competitive market, rather than the particularized and irreparable harm that warrants the granting of injunctive relief. Hence, as in *American Institute,* plaintiff has not provided any probative evidence of a threat of immediate and irreparable harm.

It is well established that "'[o]nly a viable *threat of serious harm which cannot be undone* authorizes exercise of a court's equitable power to enjoin before the merits are fully determined.'" *Zenith Radio Corp.,* 710 F.2d at 809 (emphasis in original) (quoting *S.J. Stile Assocs.,* 68 CCPA at 30, 646 F.2d at 525)). In this case, while it is clear that the action of Customs causes plaintiff increased business expenses, "an increase in business expenses alone is not irreparable injury." *American Institute,* 8 CIT at 318, 600 F. Supp. at 208. Hence, plaintiff has not shown "a viable threat of serious harm which cannot be undone." *S.J. Stile Assocs.,* 68 CCPA at 30, 646 F.2d at 525.

Moreover, "[p]reliminary injunctions are generally granted to preserve the status quo pending final determination of the controversy between the parties." *Associated Dry Goods Corp.* v. *United States,* 1 CIT 306, 311, 515 F. Supp. 775, 780 (1981) (citing *Washington Metro. Area Transit Comm'n* v. *Holiday Tours, Inc.,* 559 F.2d 841, 844 (D.C. Cir. 1977)). It is important to note that, in this case, plaintiff's motion for a preliminary injunction seeks an order permitting entry of the imported

steel forgings, the same relief that would be obtained if plaintiff were successful at trial. This court has also noted that "[w]hen the granting of a motion for preliminary injunction would give a plaintiff all the advantages which would be obtained as a result of a final favorable adjudication of the controversy, the motion ordinarily should be denied." *Associated Dry Goods,* 1 CIT at 311, 515 F. Supp. at 780 (citing *Selchow & Righter Co.* v. *Western Printing & Lithographing Co.,* 112 F.2d 430, 431 (7th Cir. 1940)). *See also R.J.F. Fabrics, Inc.* v. *United States,* 10 CIT 735, 742, 651 F. Supp. 1431, 1436 (1986).

In addition to plaintiff's failure to establish a threat of immediate and irreparable injury, there is also a question as to whether plaintiff is likely to succeed on the merits. In its brief, plaintiff asserts that "[t]he evidence in this case shows convincingly that [plaintiff] is likely to succeed on the merits and that the Dallas district office acted contrary to law in issuing the instant marking notices, denying the protest and seizing [plaintiff]'s property."

Under section 304 of the Tariff Act of 1930, "every article of foreign origin * * * imported into the United States shall be marked in a conspicuous place * * * in such manner as to indicate to an *ultimate purchaser* in the United States the English name of the country of origin of the article." 19 U.S.C. § 1304(a) (1988) (emphasis added). Customs Regulation 134.1(d)(1) provides that "[i]f an imported article will be used in manufacture, the manufacturer may be the 'ultimate purchaser' if he subjects the imported article to a process which results in a *substantial transformation* of the article, even though the process may not result in a new or different article." (emphasis added). Hence, imported merchandise is exempt from the country of origin marking required by the Tariff Act of 1930 if the merchandise undergoes a "substantial transformation" as part of a manufacturing operation in the United States. *See National Juice Prods. Ass'n* v. *United States,* 10 CIT 48, 58, 628 F. Supp. 978, 988 (1986); *Uniroyal, Inc.* v. *United States,* 3 CIT 220, 224, 542 F. Supp. 1026, 1029 (1982), *aff'd,* 702 F.2d 1022 (Fed. Cir. 1983). Under Customs Regulation 134.35 "[a]n article used in the U.S. in manufacture which results in an article having a name, character, or use different from that of the imported article, will be * * * excepted from marking."

It is well established that "[t]o determine whether a substantial transformation of an article has occurred for purpose of ascertaining who is the 'ultimate purchaser,' each case must be decided on its own particular facts." *Uniroyal,* 3 CIT at 224, 542 F. Supp. at 1029. Nevertheless, in support of its contention that the imported steel forgings are "substantially transformed" into mechanics hand tools after importation, plaintiff relies on *Ferrostaal Metals Corp.* v. *United States,* 11 CIT 470, 664 F. Supp. 535 (1987).

In *Ferrostaal,* this court determined that the merchandise had been changed in name, character, and use, and hence had undergone a "substantial transformation." *See* 11 CIT at 477–78, 664 F. Supp. at 540–41.

In contrast, in this case, as stated by Mr. Doak, the imported steel forgings "are readily recognizable components of flex handles, speeder wrenches, flex sockets and universal joints." Hence, there is a question as to whether there are major changes in the appearance or character of the imported steel forgings after further manufacture by plaintiff. In addition, there is also a question as to whether the manufacturing operations performed on the steel forgings, after importation, changed their use. According to Mr. Doak, as imported, the forgings were "readily recognizable components" of mechanics hand tools, and after importation "[t]he identity of the imported components does not change, in that they are designed exclusively to be used as components of the finished tools."

It is important to note that section 304 of the Tariff Act of 1930 "reflects the Congressional intent that the public be apprised of the country of origin of merchandise." *Globemaster, Inc.* v. *United States,* 68 Cust. Ct. 77, 80, C.D. 4340 (1972). In enacting section 304, Congress was "aware of the fact that many consumers prefer merchandise produced in this country, and sought '* * * to confer an advantage on domestic producers of competing goods.' " *Id.* (quoting *United States* v. *Ury,* 106 F.2d 28, 29 (2d Cir. 1939)). Congress also sought "to enable the 'ultimate purchaser' of the goods to decide for himself whether he would 'buy or refuse to buy them.' " *Id. See also Uniroyal,* 3 CIT at 223, 542 F. Supp. at 1029. Hence, it is clear that to permit foreign merchandise to enter without country of origin marking would be contrary to the intent of Congress and not in the public interest.

As this court has noted, "[i]n cases which seriously affect the public interest, a court of equity will require a much stronger showing before granting a preliminary injunction than is required when only private interests are at stake." *Associated Dry Goods,* 1 CIT at 310, 515 F. Supp. at 779. In the words of the Supreme Court:

> where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff.

*Yakus* v. *United States,* 321 U.S. 414, 440 (1944).

In this case, there remains a question as to whether the imported steel forgings are items of foreign manufacture, for purposes of 19 U.S.C. § 1304, and should contain country of origin markings. Accordingly, it is not in the public interest to grant plaintiff's motion for an injunction.

In sum, the balance of hardships favors the denial of the requested injunction. Plaintiff's allegations, that the denial of entry to the imported steel forgings will cause it immediate and irreparable harm, are supported only by the allegations set forth in the affidavit of its president and general manager, Mr. Mahoney. Hence, plaintiff has presented no probative evidence of the alleged injury or threatened injury.

It is the holding of the court that plaintiff has not met the requirements for a preliminary injunction. Accordingly, plaintiff's motion is denied.