DAIDO CORPORATION, Daido Kogyo Co., Ltd., and Enuma Chain Manufacturing Co., Ltd., Plaintiffs,

v.

The UNITED STATES; the Department of Commerce; Barbara H. Franklin, Secretary of Commerce; Timothy J. Hauser, Acting UnderSecretary of Commerce for International Trade; Alan Dunn, Assistant Secretary of Commerce for Import Administration, Defendants,

and

The American Chain Association, Intervenor–Defendant.

Court No. 92–07–00429.

United States Court of International Trade.

Nov. 25, 1992.

Tanaka Ritger & Middleton, Patrick F. O'Leary, Washington, DC, for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice and, Jeffrey M. Telep, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC (Patrick Gallagher, of counsel), for defendants.

Covington & Burling, David E. McGiffert and David R. Grace, Washington, DC, for intervenor-defendant.

## OPINION AND ORDER

AQUILINO, Judge:

The background of this action, commenced by the plaintiffs for extraordinary equitable relief, is set forth in the court's slip op. 92–129, 16 CIT ——, 796 F.Supp. 533 (1992), familiarity with which is presumed. As stated therein, the action has its genesis in the Treasury Department's finding of dumping *sub nom. Roller Chain, Other Than Bicycle, From Japan,* 38 Fed.Reg. 9,926 (April 12, 1973), and plaintiffs' subsequent, continuing efforts to obtain revocation of this finding before the International Trade Administration, U.S. Department of Commerce ("ITA").

According to *Roller Chain, Other Than Bicycle, From Japan; Final Results of Antidumping Duty Administrative Review and Determination Not To Revoke in Part,* 56 Fed.Reg. 50,092 (Oct. 3, 1991), the ITA decided not to effectuate a 1977 determination by Treasury to revoke as against the plaintiffs, pending conduct of a review of the period April 1, 1990 to March 31, 1991 pursuant to 19 U.S.C. § 1675. However, on May 22, 1992 the ITA

> notified plaintiffs that there would be a delay in the 1990–91 review due to lack of funding [and f]urther ... announced initiation of a new administrative review for the April 1, 1991–March 31, 1992 period ... requested by the American Chain Association.... Consequently, ... Commerce sent plaintiffs a 1991–92 review questionnaire with a response deadline of July 6, 1992. Plaintiffs' request ... for deferral of the questionnaire responses pending completion of the 1990–91 review and finalization of the revocation was rejected by Commerce....

16 CIT at ——, 796 F.Supp. at 535. This action ensued, with plaintiffs' seeking relief by way of a temporary restraining order, preliminary injunction and/or writ of mandamus.

Among other things in slip op. 92–129, the court concluded that there is no dispute as to jurisdiction pursuant to 28 U.S.C. § 1581(i)(4). 16 CIT at ——, 796 F.Supp. at 536. Also, defendants'

> long-standing disregard for statutory deadlines in administrative reviews has repeatedly been judicially condemned and required judicial intervention.... Here, plaintiffs' urgent need for a writ of mandamus has to a large extent been obviated by Commerce's commitment to plaintiffs and to the court at the hearing on July 8, 1992 to make the necessary allocation of funding to the 1990–91 review and adhere to the following timetable: September 1, 1992 for the preliminary results; November 15, 1992 for the final results.... Plaintiffs have accepted the foregoing timetable. Consequently, imposition of the extraordinary remedy of mandamus is deemed unwarranted at this time. However, the court will accede to plaintiffs' request to retain jurisdiction in this case and plaintiffs' application for mandamus will be held in abeyance pending the outcome of Commerce's conformance to the stipulated deadlines for issuing the preliminary and final results of the review.

*Id.* (citations omitted).

As for plaintiffs' application for a preliminary injunction against ITA conduct of an administrative review for 1991–92 before final determination of whether or not to revoke based on the review results for the preceding year, the court denied the relief requested, albeit on condition that,

> should plaintiffs claim during the pendency of this action that the alleged threat of retaliatory refusal to revoke for failure to answer the questionnaires by the extended deadline has materialized in the course of the 1990–91 review, this court will reconsider plaintiffs' requested

injunctive and mandamus relief for such retaliation.

16 CIT at ——, 796 F.Supp. at 538.

I

Since issuance of slip op. 92–129, the ITA has published *Roller Chain, Other Than Bicycle, From Japan; Preliminary Results of Antidumping Finding Administrative Review*, 57 Fed.Reg. 41,471, 41,472 (Sept. 10, 1992), finding weighted-average margins for 1990–91 of 0.02 percent for Daido Kogyo and 0.00 for Enuma and reciting that it had been the agency's

> original intention to revoke the finding with respect to Daido and Enuma subsequent to completion of the administrative review of the 1986–1987 period.... However, in *Freeport Minerals Co. v. United States*, 776 F.2d 1029 (Fed.Cir., 1985), the Court ... emphasized the need to base revocation determinations on "current data", and held that such determinations should not be based on information more than three years old. By the time the final results of the 1986–1987 review were published ..., the data on which the tentative revocation would be based were more than four years old. Accordingly, we concluded at that time that we would conduct a review of a more recent period before deciding whether to revoke the finding with respect to these two companies.

Notwithstanding this stated, original intention, plus written company commitments to an immediate suspension of liquidation and reinstatement of the finding of dumping should sales at less than fair value resume, the ITA went on to report:

> ... [B]ecause of confidential information in our possession, we are unable to make a determination at this time that sales at less than fair value will not occur in the

future. Therefore, we will not consider revocation at this time.

*Id.*, 57 Fed.Reg. at 41,473.

The plaintiffs have returned to court with a motion for release of the confidential information referred to, complaining that "this hurdle seems insurmountable because the ITA has consistently rebuffed [their] efforts to gain access to this so-called 'confidential' information." [1] In addition, they have returned with a renewed application for a temporary restraining order and preliminary injunction, posturing that the ITA "has done almost everything imaginable to prevent [them] from getting a fair shot at revocation." [2]

Though plaintiffs' papers are replete with such hyperbole, the court discerned enough in them to warrant issuance of an order restraining the defendants temporarily from taking any further steps on administrative review of either 1990–91 or 1991–92 and also directing the government to show cause why it should not be enjoined preliminarily (1) from issuing a final determination for 1990–91 "until [p]laintiffs have the opportunity to challenge, through the briefing and hearing process, the so-called 'confidential' information" and (2) from requiring responses to questionnaires issued for 1991–92. A hearing has since been held in open court on these issues.

II

Attached to a case brief submitted by the American Chain Association to the ITA in conjunction with administrative review of 1986–87 was a document apparently written months earlier by an unnamed individual and received by its attorneys concerning questionnaire responses filed by respondents Daido *et al.* Counsel's transmittal represented the information to be

> highly sensitive in nature, and its disclosure could ... prove deleterious should the Commerce Department decide to in-

---

1. Memorandum in Support of Plaintiffs' Motion for Release of Confidential Information, p. 2 (footnote omitted). This motion was accompanied by a motion to amend plaintiffs' complaint, essentially to assert jurisdiction pursuant to 28 U.S.C. § 1581(f). That motion is hereby granted.

2. Memorandum of Law in Support of Plaintiffs' Application for Temporary Restraining Order and Preliminary Injunction [hereinafter referred to as "Plaintiffs' Nov. 5 Memorandum"], pp. 1–2 (Nov. 5, 1992).

quire further into the matter.... [P]ublic disclosure at this juncture could needlessly prejudice and/or embarrass Daido Kogyo, Enuma Chain, and Daido Corporation (U.S.A.). In light ... of these considerations, the ACA submits that the information qualifies for confidential treatment under 19 C.F.R. § 353.32(a). ... In view of the ... Commerce Department's policy interest in encouraging knowledgeable parties to come forward in antidumping proceedings, information that could be used to identify the author of the letter deserves the strictest protection. We therefore request that this information be exempt from release under Administrative Protective Order.[3]

The agency acquiesced in this request, deciding not to release the information on grounds that it has authority to exempt from disclosure matter of a type for which there is a clear and compelling need to withhold, citing 19 C.F.R. §§ 353.33 and 353.34(a), and that the information sought "is in fact of such a highly sensitive nature that it clearly should not be released."[4] The government continues to oppose discovery, contending now that the information the plaintiffs seek should be protected "pursuant to the informant's privilege, the investigative files privilege, and because of a clear and compelling need to prevent disclosure."[5]

### A

The Trade Agreements Act of 1979, as amended, provides for disclosure under protective order of confidential information submitted to the ITA, in general, as follows:

> Upon receipt of an application ..., the administering authority ... shall make all business proprietary information presented to, or obtained by it, during a proceeding (except privileged information, classified information, and specific information of a type for which there is a clear and compelling need to withhold from disclosure) available to interested parties who are parties to the proceeding under a protective order ... regardless of when the information is submitted during a proceeding....

19 U.S.C. § 1677f(c)(1)(A).

After the plaintiffs had become formal parties to the proceedings for administrative review of the year April 1, 1990–March 31, 1991, counsel for the American Chain Association resubmitted the informer's document. Upon release of the preliminary results of that review, quoted in part I above, plaintiffs' attorney demanded disclosure of "the 'confidential information' which has caused the ITA to not consider the Companies' request for revocation", arguing that it had become the "pivotal fact" in denial of revocation.[6] The agency's response apparently was to notify counsel that it would grant his "APO request" but not to the extent of producing the information.[7]

On the question of privilege attaching to a government informer, traditional teaching has been to the effect that the

> privilege applies only to the *identity* of the informer, and not to his communica-

---

3. Attachment 2 to Affidavit of Patrick F. O'Leary, p. 2 (Letter from David R. Grace to Secretary of Commerce (June 28, 1991)).

4. Attachment 5 to Affidavit of Patrick F. O'Leary, p. 2 (July 5, 1991) (footnote omitted).

5. Defendants' Memorandum in Opposition to Plaintiffs' Motion for Release of Confidential Information, p. 2 (footnote omitted).

6. Attachment 23 to Affidavit of Patrick F. O'Leary, p. 2 (Sept. 3, 1992).

7. *See* Attachment 27 to Affidavit of Patrick F. O'Leary.

The plaintiffs then filed their motion with the court to compel disclosure. The defendants prepared public and confidential versions of

their response to this motion, the latter of which has attached allegedly-privileged documents, including that of the informer. Apparently, that version was inadvertently served on plaintiffs' counsel, as well as filed with the court. Allegedly believing he was under "no obligation not to look at the 'confidential' document [, a]ccordingly, [he] reviewed" it. Affidavit of Patrick F. O'Leary, para. 39. When defendants' attorneys discovered the mistake and demanded return of their confidential memorandum in opposition, Mr. O'Leary complied upon a representation that he had not disclosed the contested information to his clients. *See id.,* para. 40 and attachment 30 thereto.

tion as such. Of course, if disclosure of the contents of his statement would tend to disclose the identity of the informer, the communication itself should come within the privilege, but solely to the extent necessary to preserve the informer's anonymity.

VIII Wigmore on Evidence § 2374, at 765 (McNaughton rev. 1961) (emphasis in original; footnotes omitted). In *Roviaro v. United States*, 353 U.S. 53, 59–61, 62, 77 S.Ct. 623, 627–28, 628–29, 1 L.Ed.2d 639 (1957), the Supreme Court discussed the phenomenon in the following manner:

> What is usually referred to as the informer's privilege is in reality the Government's privilege *to withhold from disclosure the identity* of persons who furnish information of violations of law to officers charged with enforcement of that law.... The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.

> The scope of the privilege is limited by its underlying purpose. Thus, where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged. Likewise, once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable.

> A further limitation on the applicability of the privilege arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, *or is essential to a fair determination of a cause,* the privilege must give way....

> \* \* \* \* \* \*

> We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing

the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.[8]

■ *Roviaro* was a criminal case, but an informer's identity can be privileged in civil matters. *See generally* Developments in the Law, *Privileged Communications*, 98 Harv.L.Rev. 1450 (1985), and cases cited therein. Indeed, some courts have concluded that the privilege is stronger in civil cases, while others have applied the same standard to both kinds of actions. *Compare, e.g., In re United States*, 565 F.2d 19, 22 (2d Cir.1977), *cert. denied sub nom. Bell v. Socialist Workers Party*, 436 U.S. 962, 98 S.Ct. 3082, 57 L.Ed.2d 1129 (1978), *with Hodgson v. Charles Martin Inspectors of Petroleum, Inc.*, 459 F.2d 303, 305 & n. 2 (5th Cir.1972). Whatever the approach, this Court of International Trade clearly has jurisdiction to enforce it in an action such as this. *See* 19 U.S.C. § 1677f(c)(2); 28 U.S.C. § 1581(f) and § 2641(b).

■ Generally, as the nature of the asserted privilege implies, an informer is in privity with law-enforcement officer(s). But that is not the scenario at bar. Rather, the tipster sent its document to counsel for the American Chain Association as well as to other persons. There was no delivery to the government, nor is an expectation of such transmittal readily apparent from the document itself. On the other hand, given the Association's direct involvement in the administrative proceedings, it cannot be said that what ultimately happened, to wit, forwarding to the ITA followed by substantive reaction, was out of the question. In short, the court cannot conclude in light of this involvement that lack of privity between informer and government prevents the latter from now asserting its privilege. *Cf. Martin v. Albany Business Journal,*

8. Footnotes omitted.

*Inc.,* 780 F.Supp. 927 (N.D.N.Y.1992); McCormick on Evidence § 111, at 408 (4th ed. 1992).

■ Regarding the delivery of the confidential version of defendants' memorandum to opposing counsel, the

> traditional judicial approach places the risk of inadvertent disclosure on the holder of the privilege. Under this approach, any disclosure, whether intentional or not, is deemed a waiver.

98 Harv.L.Rev. at 1660, citing *In re Grand Jury Investigation of Ocean Transp.*, 604 F.2d 672, 675 (D.C.Cir.), *cert. denied sub nom. Sea–Land Service, Inc. v. United States*, 444 U.S. 915, 100 S.Ct. 229, 62 L.Ed.2d 169 (1979); *United States v. Kelsey–Hayes Wheel Co.*, 15 F.R.D. 461, 465 (E.D.Mich.1954); VIII Wigmore on Evidence § 2325, at 633. But not all courts have followed this approach. In *Mendenhall v. Barber–Greene Co.*, 531 F.Supp. 951, 955 n. 8 (N.D.Ill.1982), for example, the court characterized it as "atavistic, generating (in much the same way as a flawed pleading in the era of common law pleading) harsh results out of all proportion to the mistake of inadvertent disclosure."

There is no indication that the occurrence herein was anything other than a mistake. Moreover, since the informer privilege aims to protect identity, which is not directly stated on the documents appended to defendants' confidential memorandum, and since their contents apparently did not go beyond counsel to someone possibly better able to discern that identity, the court cannot conclude that effective waiver of the protection of the critical fact has taken place. *Cf.* 2 Weinstein's Evidence para. 510[04], at 510–26 (1992) ("once the identity of the informer is disclosed 'to those who would have cause to resent the communication' no further reason remains for applying the privilege"), citing *Roviaro, supra.*

That the reason for applying the privilege remains intact, however, is not an automatic basis for denial of any and all discovery. Clearly, the informer's document at bar contains references tending to reveal identity, the nature of which could cause the type of emotion sought to be avoided. Therefore, those references should not be disclosed, but, on the other hand, the court is not persuaded that other information therein is so inextricably intertwined with its source's identity as to protect it from formal revelation to plaintiffs' counsel in the pursuit of their interests.

**B**

The government, in the pursuit of its interests, has apparently started investigation of the references in the informer's document which is beyond the scope of the ITA proceedings. This activity, in turn, has begun to generate documents of its own, including those inadvertently delivered to plaintiffs' counsel. The defendants attempt now to cloak all of the confidential information with investigatory privilege. To properly do so,

> (1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege.

*In re Sealed Case*, 856 F.2d 268, 271 (D.C.Cir.1988), citing *Black v. Sheraton Corp. of America*, 564 F.2d 531, 542–43 (D.C.Cir.1977), and *Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1341–42 (D.C.Cir.1984).

The court has reviewed confidential affidavit(s) submitted on behalf of the government and finds its attempted assertion in compliance with the foregoing standards. Hence, the court must balance the public interest in nondisclosure against plaintiffs' need for access to the privileged information. In *Black*, the court stated that "[j]udicial recognition of an executive privilege depends upon 'a weighing of the public interests that would be served by disclosure in a particular case.'" 564 F.2d at 545, quoting *Nixon v. Sirica*, 487 F.2d 700, 716 (D.C.Cir.1973). The factors to be considered in such an analysis were set forth at length in *Friedman*, 738 F.2d at 1342–

43, quoting *Frankenhauser v. Rizzo*, 59 F.R.D. 339, 344 (E.D.Pa.1973), to wit:

(1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) the impact upon persons who have given information of having their identities disclosed; (3) the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure; (4) whether the information sought is factual data or evaluative summary; (5) whether the party seeking discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question; (6) whether the police investigation has been completed; (7) whether any intradepartmental disciplinary proceedings have arisen or may arise from the investigation; (8) whether the plaintiff's suit is non-frivolous and brought in good faith; (9) whether the information sought is available through other discovery or from other sources; and (10) the importance of the information sought to the plaintiff's case.

At this seemingly-early moment of investigation, the plaintiffs have not (and probably could not have) tipped the scale on these factors in their favor. Hence, defendants' asserted privilege must stand, at least for now. However, this particular privilege does not protect from discovery the informer's document, which from the beginning has been in the hands of others and which is at the heart of the ITA's current proceedings.

### C

 Nonetheless, the defendants take the position that there is a clear and compelling need within the meaning of 19 U.S.C. § 1677f(c)(1)(A), *supra*, to withhold its disclosure.

When the agency attempts to rely on this provision, the court will consider the matter *de novo* to determine whether such a need in fact exists. *E.g., Bethlehem Steel Corp. v. United States*, 13 CIT 617, 618, 718 F.Supp. 70, 71 (1989); *D & L Supply Co. v. United States*, 12 CIT 732, 734, 693 F.Supp. 1179, 1181 (1988). And in rendering a decision, the court must balance the interests of the government in preventing disclosure with those of the party demanding access. In this instance, the agency has indicated, at least preliminarily, that the document in question is the linchpin of its determination not to revoke. As long as this is the case, to preclude opposing counsel from formal knowledge of any of its contents clearly would tend to foreclose the kind of meaningful opportunity to participate contemplated by the Trade Agreements Act of 1979, as amended.

Indeed, it has been held that the fact that information is confidential is insufficient on its own to prove clear and compelling need to withhold it from disclosure. *E.g., Allied Tube & Conduit Corp. v. United States*, 13 CIT 698, 706, 721 F.Supp. 305, 312 (1989), *aff'd*, 898 F.2d 780 (Fed.Cir.1990). Where there exist adequate safeguards to prevent such information from passing beyond the eyes for which access is appropriate, the

mere possibility that information could be inadvertently disclosed under an APO is not enough to overcome the statutory policy favoring disclosure. Moreover, the imposition of sanctions for even inadvertent disclosures militates against this possibility.

*Komatsu Forklift Manufacturing Co. v. United States*, 13 CIT 578, 582–83, 717 F.Supp. 843, 846 (1989) (citation omitted). Furthermore, the fear that the information provided to an attorney might find its way to the client is not enough to prevent disclosure, although other cases have considered the possible chilling effect court-ordered disclosure might have on future investigations. *E.g., American Brass v. United States*, 12 CIT 1068, 1073, 699 F.Supp. 934, 938 (1988). In sum, while the government has a clear interest in protecting sources in order to encourage others to come forth with information, that interest cannot be equated automatically with a compelling need to withhold, which appears to be the attempt here.

### III

Plaintiffs' application (and existing temporary restraining order) are aimed not

only at the ITA's administrative review of the period April 1, 1990 to March 31, 1991 but also at April 1, 1991 to March 31, 1992, initiation of which was noticed on May 22, 1992, 57 Fed.Reg. 21,769. Apparently, agency questionnaires for that later year issued the same day to the plaintiffs. Their counsel quickly requested that the "ITA withdraw the ... questionnaires pending completion of the 1990–1991 review and finalization of the revocation"[9] upon the following representation:

> The sending of the 1991–1992 period questionnaires and requiring submission of answers thereto by July 6, 1992 creates additional and presumably unnecessary burdens on the Companies. If the 1990–1991 period final results are published and the dumping finding revoked this summer, the Companies will have expended considerable time and money unnecessarily answering questionnaires. As indicated above, the ITA has not seen fit in the past to require the Companies to answer questionnaires for periods not part of the process connected with the pending finalization of the revocation. Moreover, the above quoted comments from the 1986–1987 period final results clearly emphasize that future investigations were to be limited to "a"—obviously meaning one—"review of a more recent period". That review can be completed as soon as the ITA resolves its money problems. In the interim, the Companies should not be burdened by the need to answer additional questionnaires.[10]

The ITA declined the request to withdraw but did extend its deadline two weeks until July 20, 1992, by which time this action already had been commenced. On September 10, 1992 the agency sent the plaintiffs a letter reminding them that slip op. 92–129, 16 CIT ——, 796 F.Supp. 533, *supra*, had "not relieved ... their responsibility to respond"[11] to the May 22 questionnaires. Counsel then presented a request to extend their time to answer until January 15, 1993, whereupon the ITA reacted

on September 22, 1992 that responses were due no later than the next day, September 23rd.

That deadline has passed without plaintiffs' compliance, with the indication that the agency will now resort to best information otherwise available within the meaning of 19 U.S.C. § 1677e(c) in carrying out its administrative review of 1991–92. This expectation has led counsel to now project that his clients will "get saddled with a BIA dumping margin for 1991–1992, which, in turn spawns an alternative basis for permanently denying revocation and grounds for mooting the 1990–1991 period lawsuit." Plaintiffs' Nov. 5 Memorandum, p. 8.

Plaintiffs' instant application sets forth a suggested schedule of events which proposes a deadline for answering the 1991–92 questionnaires, "if necessary", some 62 days after the deadline suggested for the final results of the review of the preceding year. Neither the defendants nor the intervenor-defendant have indicated any willingness to attempt to accommodate their adversaries' perceived predicament, which, as the court recognized in slip op. 92–129, 16 CIT ——, 796 F.Supp. 533, clearly is not entirely of their own making.

Whatever the particular responsibilities, the defendants and intervenor-defendant oppose grant of any stay, which can only occur when an applicant therefor establishes a threat of immediate irreparable harm, the likelihood of success on the merits, that the public interest would be better served by issuing rather than by denying an injunction, and a balance of hardship in its favor. *E.g., S.J. Stile Associates Ltd. v. Snyder*, 68 CCPA 27, 30, C.A.D. 1261, 646 F.2d 522, 525 (1981); *Federal–Mogul Corporation v. United States*, 16 CIT ——, ——, 808 F.Supp. 839, 840 (1992).

■ With regard to the requisite threat of immediate irreparable harm, the plaintiffs take the position that completion of

---

**9.** Attachment 18 to Affidavit of Patrick F. O'Leary, p. 2 (May 27, 1992).

**10.** *Id.*

**11.** Attachment 26 to Affidavit of Patrick F. O'Leary.

the administrative review of 1991–92 before court consideration of the final determination as to the prior year has run its course could effectively preclude judicial relief of the kind they seek. They refer to *Zenith Radio Corporation v. United States*, 710 F.2d 806, 810 (Fed.Cir.1983), wherein the court concluded

> that liquidation would ... eliminate the only remedy available to Zenith for an incorrect review determination by depriving the trial court of the ability to assess dumping duties on Zenith's competitors in accordance with a correct margin on entries in the '79–'80 review period. The result of liquidating the '79–'80 entries would not be economic only.... Zenith's statutory right to obtain judicial review of the determination would be without meaning for the only entries permanently affected by that determination. In the context of Congressional intent in passing the Trade Agreements Act of 1979 and the existing finding of injury to the industry underlying T.D. 71–76, we conclude that the consequences of liquidation do constitute irreparable injury.

While that case focused on the irrevocability of liquidation, its import reaches this action as well, to wit, in the absence of an injunction the plaintiffs could lose their statutory right to meaningful court review of ITA denial of revocation, which can have consequences extending years into the future. *Cf.* 19 C.F.R. § 353.25 (1992) (revocation permissible in the absence of dumping for a period of "at least three consecutive years"). Indeed, this court has held that time is an element of irreparability. *Bomont Industries v. United States*, 10 CIT 431, 437, 638 F.Supp. 1334, 1339 (1986).

The threat of immediate irreparable harm, as perceived by the plaintiffs, is based on application of best information

otherwise available in the absence of questionnaire responses for 1991–92 which counsel predict could lead to dumping margins of 15.92 or 43.29 percent[12] in contrast to years heretofore reviewed when margins found to exist were *de minimis*. While the court abstains from any view at this time on the propriety of reliance on best information otherwise available for that year, it is constrained to conclude that that potential does amount, at a minimum, to a present threat of irreparable harm to the plaintiffs.[13]

Both the governing statute, 19 U.S.C. § 1675(c), and the above-cited regulation make clear that revocation is discretionary on the part of the ITA, even when the specified conditions exist. *Cf. Manufacturas Industriales de Nogales, S.A. v. United States*, 11 CIT 531, 666 F.Supp. 1562 (1987). Hence, a showing of likelihood of success on the merits in an action like this is more onerous. On the other side, the findings in slip op. 92–129 16 CIT ——, 796 F.Supp. 533, are hardly complimentary of the defendants on those controlling issues. Moreover, this and other courts have held that although the

> extraordinary remedy of a preliminary injunction is not available unless the moving party's burden of persuasion is met as to all four of the above factors, the showing of likelihood of success on the merits is in inverse proportion to the severity of the injury the moving party will sustain without injunctive relief.

*Smith Corona Corp. v. United States*, 11 CIT 954, 965, 678 F.Supp. 285, 293 (1987), quoting *Hyundai Pipe Co. v. U.S. Department of Commerce*, 11 CIT 238, 243, 1987 WL 8807 (1987), and citing *Ceramica Regiomontana, S.A. v. United States*, 7 CIT 390, 395, 590 F.Supp. 1260, 1264 (1984), and *American Air Parcel Forwarding Co. v.*

---

**12.** *See, e.g.,* Plaintiffs' Nov. 5 Memorandum, p. 7.

**13.** In reaching this conclusion as for 1991–92, the court is unable to extend it to cover 1990–91. That is, denial of a stay of publication of a final determination for that year would not constitute harm of the degree indicated for 1991–92 in view of the alternative avenue for relief available to parties in plaintiffs' position under 19 U.S.C. § 1516a(a)(2), particularly if the subse-

quent administrative review is to be stayed. Then again, plaintiffs' having waited until September 1992 to formally request production of the informer's document may not have been considered untimely by the agency in granting them an administrative protective order on September 14th, but that timing hardly enhances their standing now to delay publication of the final determination for which this action was originally commenced.

*United States,* 1 CIT 293, 300, 515 F.Supp. 47, 53 (1981).

At this stage, that proportion favors the plaintiffs. Not only is this evident, but at the hearing the defendants had difficulty mustering reasons tending to support themselves on the remaining two requisites for injunctive relief. They could not show hardship if the court were to grant plaintiffs' application, nor did they even attempt to prove that the public interest would be better served by denial of the requested interim relief. This is no doubt the case because that interest is always the fair and efficient administration of U.S. trade laws, which is essentially what the plaintiffs have been pleading for. Furthermore, the first rule of practice of this Court of International Trade is to secure the just, speedy and inexpensive determination of every action.

### IV

To summarize the foregoing, it is the decision of the court to grant plaintiffs' motion to compel disclosure to the extent that those portions of the informer's document which do not tend to indicate its identity will be available under protective order to counsel for the plaintiffs, and only to counsel, at or after 2 p.m. on November 30, 1992. The attorneys for the defendants and for the intervenor-defendant may appear in room 769 of the courthouse at 2 p.m. on that day to review the proposed redactions prior to release of the remainder of the document's contents. In all other respects, plaintiffs' motion to compel disclosure must be, and it hereby is, denied.

It is further the decision of the court to deny plaintiffs' application for a preliminary injunction in regard to the ITA's administrative review of the year April 1, 1990 to March 31, 1991, and it hereby is denied. And it is further the decision of the court to grant plaintiffs' application in regard to the agency's administrative review of the year April 1, 1991 to March 31, 1992: The defendants and their officers, employees, agents, servants, sureties and assigns are thus hereby enjoined from any further review of importation of roller chain, other than bicycle, from Japan during the period April 1, 1991 to March 31, 1992 pending completion of similar proceedings for the preceding year April 1, 1990 to March 31, 1991 and any judicial review of the result(s) thereof.

So ordered.