The TIMKEN COMPANY, Plaintiff,

v.

UNITED STATES, Defendant.

Court No. 87–06–00738.

United States Court of International Trade.

July 14, 1987.

Stewart and Stewart, Eugene L. Stewart and Terence P. Stewart, Washington, D.C., for plaintiff.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Civil Div., Commercial Litigation Branch, U.S. Dept. of Justice, Platte B. Moring, III, Washington, D.C., for defendant.

Graham & James, Lawrence R. Walders and Brian E. McGill, Washington, D.C., for China Nat. Machinery & Equipment Import and Export Corp., amicus curiae.

## MEMORANDUM OPINION

TSOUCALAS, Judge:

This opinion is issued in conformity with this Court's order of June 24, 1987, denying plaintiff's application for a preliminary injunction. Plaintiff commenced this action to challenge a final affirmative determination by the Department of Commerce, which excluded one foreign exporter from the scope of the dumping finding. *Tapered Roller Bearings from the People's Republic of China; Final Determination of Sales at Less Than Fair Value*, 52 Fed.Reg. 19748 (May 27, 1987). Plaintiff concurrently applied for a temporary restraining order and preliminary injunction, seeking to enjoin liquidation of the entries from China National Machinery & Equipment Import & Export Corporation (CMEC), the exporter excluded from the final determination. On June 17, 1987, this Court denied plaintiff's application for a temporary restraining order and on June 23, 1987, oral arguments and a full hearing were had before this Court on whether a preliminary injunction should issue. CMEC's application to appear *amicus curiae* at the hearing was granted.

## BACKGROUND

Plaintiff is a domestic producer of tapered roller bearings (TRBs), and was petitioner below in the antidumping investigation of TRBs from the People's Republic of

China (PRC). The investigation covered two exporters: (1) CMEC, the only known exporter of TRBs from the PRC to the United States; and (2) Premier Bearing & Equipment, Limited (Premier), a Hong Kong based trading company, exporting TRBs produced in the PRC, from Hong Kong to the United States. In the PRC, the same factories produce TRBs for both companies. Therefore, when Commerce issued its preliminary determination of sales at less than fair value, a single margin of 9.65 percent was estimated for both companies, to prevent those factories from selling through the exporter with the lower margin. 52 Fed.Reg. 3833 (February 6, 1987). As of the date of that preliminary determination, liquidation of Chinese TRB entries was suspended. On May 27, 1987, Commerce published the results of its final determination that TRBs from the PRC are being sold at less than fair value with a weighted average dumping margin of .97 percent; however, no dumping margins were found for CMEC. 52 Fed.Reg. 19748 (May 27, 1987). Subsequently, the ITC determined that a domestic industry is suffering material injury or threat thereof by reason of imports from the PRC. *Tapered Roller Bearings and Parts Thereof and Certain Housings Incorporating Tapered Rollers from Hungary, The PRC, and Romania,* 52 Fed.Reg. 22399 (June 11, 1987).

As a result of the negative finding that CMEC exports were not subject to dumping duties, Commerce directed suspension of liquidation terminated for these entries. 52 Fed.Reg. 19748. Plaintiff alleges several errors committed by Commerce in its finding of no dumping by CMEC, and argues that if its contentions are ultimately sustained after the goods have been liquidated, then its remedy has been forfeited. This loss of complete relief, in conjunction with the proprietary losses, which it is alleged that plaintiff will incur, are the gravamen of plaintiff's claim of irreparable injury.

## DISCUSSION

■ In order for a preliminary injunction to issue, plaintiff must clearly demonstrate: (1) the threat of immediate irreparable harm; (2) the likelihood of success on the merits; (3) that the public interest is better served by issuing rather than by denying the injunction; and (4) that the balance of hardships to the parties favors the issuance of an injunction. *Zenith Radio Corp. v. United States,* 710 F.2d 806, 809 (Fed.Cir. 1983); *S.J. Stile Assocs., Ltd. v. Snyder,* 68 CCPA 27, 30, C.A.D. 1261, 646 F.2d 522, 525 (1981). In a flexible balancing approach, the showing of ultimate success is inversely proportional to the severity of the injury. *American Air Parcel Forwarding Co., Ltd. v. United States,* 1 CIT 293, 298, 515 F.Supp. 47, 52 (1981). "[T]he critical factors are the probability of irreparable injury to the movant should the equitable relief be withheld, and the likelihood of harm to the opposing party if the court were to grant the interlocutory injunction." 1 CIT at 299–300, 515 F.Supp. at 53; *United States Steel Corp. v. United States,* 9 CIT ——, ——, 614 F.Supp. 1241, 1243 (1985).

■ Since successful challenges to dumping determinations result in prospective relief only, the court, where appropriate, may enjoin liquidation pending the outcome of the litigation. *See* 19 U.S.C. § 1516a(c)(2) (1982); S.Rep. 96–249, 96th Cong., 1st Sess. 252–53 (1979), *reprinted in* 1979 U.S.Code Cong. & Admin.News 381, 638. In *Zenith Radio Corp. v. United States,* 710 F.2d 806 (Fed.Cir.1983), it was held that liquidation of entries, the subject of a challenged § 751 annual review determination, may constitute irreparable injury. In the context of an annual review, only one year's entries are subject to the determination. If the movant ultimately succeeds in challenging the results, the only remedy available is to liquidate the entries for that period at the corrected dumping rate. If the entries were liquidated prior to the court upholding the claim, there would be no entries upon which revised margins could be imposed. Absent an injunction, the domestic industry's only remedy would be eliminated. 710 F.2d at 810.

However, where the action contests either negative injury or negative dumping

determinations in an investigation, not annual review results, recent cases have declined to hold that liquidation alone is sufficient to establish irreparable harm. *American Spring Wire Corp. v. United States,* 7 CIT 2, 578 F.Supp. 1405 (1984); *accord Bomont Industries v. United States,* 10 CIT ——, 638 F.Supp. 1334 (1986); *U.S. Steel v. United States,* 9 CIT ——, 614 F.Supp. 1241 (1985). If the agency's decision is overturned, then unliquidated and future entries may still be subject to corrected antidumping duties. *Bomont,* 10 CIT at ——, 638 F.Supp. at 1338; *American Spring Wire,* 7 CIT at 5, 578 F.Supp. at 1407.

In these situations as opposed to annual reviews, which focus on a discrete time period, the movant still has the opportunity to obtain meaningful judicial review. Even though some entries will be liquidated without additional duties, appropriate relief may be fashioned prospectively. *American Spring Wire,* 7 CIT at 5, 578 F.Supp. at 1407. The opportunity for adequate prospective relief weighs against granting the injunction. *See National Juice Products Ass'n v. United States,* 10 CIT ——, ——, 628 F.Supp. 978, 984 (1986) (and cases cited therein).

Congress statutorily recognized that the court must weigh the traditional four factors and issue injunctive relief as an "extraordinary measure" "not [to] be granted in the ordinary course of events." S.Rep. 96–249 at 253, 1979 U.S.Code Cong. & Admin.News at 639. This is not a situation where plaintiff's "statutory right to obtain judicial review of the determination would be without meaning for the only entries permanently affected by that determination." *Zenith,* 710 F.2d at 810. While plaintiff may not be satisfied that a successful challenge will result in only prospective relief, it retains both its statutory right and a remedy which may be pursued. Some further affirmative showing on plaintiff's part as to irreparable injury is required.

In *Bomont Industries,* the court similarly considered whether an injunction should issue pending the challenge to a final nega-

tive determination. In addressing the irreparable harm criteria the court considered whether admission of these goods "without the possibility of offsetting dumping duties will prevent Bomont from recovering profitability, prolong its period of losses, deprive it of working capital, and threaten its very existence." 10 CIT at ——, 638 F.Supp. at 1338. The court found that the requisite showing of irreparable harm was not met where the movant therein: (1) had difficulty competing in the marketplace; (2) experienced a drop in sales and net loss for the first third of that year; (3) achieved an operating profit for the previous year; and (4) for the year preceding that period, sustained a net loss.

Mr. John Hill, plaintiff's Director of Marketing, testified that U.S. import statistics reveal a fivefold increase in TRB consumption in the United States from 1986 to 1987 without a commensurate increase in domestic production but with a dramatic increase in shipments from China. While plaintiff experienced a slight increase in the volume of shipments of TRBs for the first quarter of 1987, this was offset by price depression (approximately 12% from the eight specific models under investigation for the period April 1986–1987). Mr. Hill testified this could have a significant effect on this price sensitive market. Based on field investigations by his sales representatives, Mr. Hill's opinion was that CMEC prices could be as low as 40% below U.S. prices for comparable products and sales; as a result of lost sales and depressed market from those eight parts, plaintiff has incurred several million dollars in lost revenue.

■ The evidence further indicated that plaintiff's identified losses in the first quarter of 1987 are clearly in excess of U.S. bearing operating profits in 1986. However, SEC reports submitted by plaintiff state that plaintiff's sales were up in the first quarter of 1987 and a similar upswing in the bearing business was further reported. Nevertheless, irreparable injury is not just the mere possibility of injury, *S.J. Stile Assocs.,* 68 CCPA at 30, 646 F.2d at 525; but harm which is imminent regardless of its magnitude. *National Juice*

*Products Ass'n,* 10 CIT at ——, 628 F.Supp. at 984.

■ Even assuming that these losses are documented and uncontroverted, the question remains whether they are by reason of, and will continue to be a result of, the exports by CMEC. It is in the attempt to causally link these losses from price suppressions, with CMEC exports, that plaintiff's proof fails. Plaintiff adduced evidence that sales by a competitor, who sells Chinese TRBs, were made at substantially lower prices than plaintiff offers, and plaintiff lost sales as a result of this significant underselling. Nonetheless, for purposes of resolving whether the instant application is warranted the issue is not whether Chinese imports undersold plaintiff (*see Bomont Industries, supra*), rather, it is whether the specific *CMEC* exports threaten immediate irreparable harm. The Court was not convinced on this issue for the following reasons.

The affidavits submitted contained field reports from plaintiff's sales representatives, who obtained competitors' price information from their customers. While these reports identify China as the country of origin of these lower priced TRBs, one report further names the supplier which is apparently a Japanese facility. Secondly, an affidavit submitted from the Vice Managing Director of the Bearing Department at CMEC reveals that although some TRBs were shipped to the United States in the first quarter of 1987, they were pursuant to sales contracts entered into more than one year ago and in one case, in April 1985. *Compare Haarman & Reimer Corp. v. United States,* 1 CIT 148, 509 F.Supp. 1276 (1981) (no irreparable injury where imports were presold six months to two years prior to actual delivery, thus, would not be imported within period under review). The last sales contract entered into was in May 1986. Counsel for CMEC represented that only a small amount of that outstanding contract order remains to be shipped.

Plaintiff further argues that a crucial fact herein, not present in *Bomont,* is that the ITC has found material injury to the domestic industry, which was central to the court's decision in *Zenith.* Although a finding of material injury may be probative in determining irreparable harm, in this instance the ITC's determination of material injury resulted from cumulatively assessing the volume and effect of imports from the PRC, Hungary, Romania, Yugoslavia, Japan and Italy. *See* USITC Publication No. 1983 at 12–13 (June 1987). Thus, there was not a finding that by reason of the PRC imports alone, material injury threatened the domestic industry.

Further, PRC exports amounted to one tenth of one percent of the market share of TRB consumption in terms of value and units, and accounted for .2 percent of the market share of imports subject to less than fair value determinations. *Id.* at A–51, A–53. Mr. Hill testified though, that even this fragment of imports could be a significant market share when it serves to depress prices; thus, termination of suspension could affect plaintiff's ability to generate profits. Yet the evidence does not demonstrate that the increase in imports from China in 1987 was (1) from CMEC directly or (2) that the significant increase occurred after February 1987 (when the liquidation was originally suspended).

Moreover, in balancing the hardships, the Court notes that even if suspension continued, there would be no estimated dumping duties imposed, since the margin by which CMEC was found to be dumping was zero. This amount would change only upon a successful challenge on the merits and a subsequent revised determination by Commerce. As mentioned by defendant and *amicus curiae,* suspension would not terminate sale of the goods, but would cause uncertainty to the importers and independent businesses as to the ultimate price of the goods.

■ Plaintiff's initial substantive allegation is that the ITA constructed foreign market value on the basis of factors of production when it was unable to verify the information relied upon and when verifiable price information was available. Secondly, figures used for factory overhead were contradictory to the evidence of other

foreign and domestic producers' actual figures. However, it is noted that Commerce is permitted to consider comparability in economies when choosing constructed value over prices, *Chemical Products Corp. v. United States*, 10 CIT ———, 645 F.Supp. 289 (1986), and the same rationale would seem to apply when rejecting factors of production information from noncomparable surrogate countries.

It is further claimed that Commerce denied plaintiff due process by using data in the final calculations which (a) was supplied after the public hearing was held and briefs were submitted; (b) originated from a company who never submitted a surrogate producer questionnaire; and (c) has no support in the record that it was verified. Defendant responds that Commerce was placed in a "best information available" situation and thus, verification is not required. Where a non-market economy, such as the PRC, is under investigation, Commerce must determine foreign market value by reference to surrogate country data. When a comparable surrogate refuses to cooperate, Commerce is faced with competing obligations: on the one hand it must search for a source of reliable accurate data; on the other it must reach its determination within a restricted time frame. Thus, if placed in this best information available situation, the ability to obtain the desired precision in data is seriously constrained. *See generally Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1560 (1984); *Ansaldo Componenti v. United States*, 10 CIT ———, 628 F.Supp. 198 (1986). Therefore, it is not entirely clear that the agency's use of this information was unreasonable.

Plaintiff also states that Commerce failed to consider full factory overhead expenses; misapplied the excise tax factor; and used inconsistent sources of data for new steel prices and scrap value comparisons. Although at this juncture the Court sees some merit to plaintiff's claims as relate to the latter two factors, this alone is not sufficient to meet plaintiff's burden. "Failure of an applicant to bear its burden of persuasion on irreparable harm is ground to deny a preliminary injunction,

and the court need not conclusively determine the other criteria". *Bomont Industries*, 10 CIT at ———, 683 F.Supp. at 1340.

### CONCLUSION

Plaintiff has failed to establish that it will suffer immediate irreparable harm by reason of the specific imports by CMEC without offsetting dumping duties. Therefore, plaintiff's application for a preliminary injunction must be denied. It has been so ordered.