SANDOZ CHEMICALS CORP, PLAINTIFF *v.* UNITED STATES, DEFENDANT, AND ATUL PRODUCTS LTD., BIDDLE SAWYER CORP, C.H. PATRICK & CO., INC., INTERNATIONAL TECHNICAL SERVICES, LTD., ET AL., DEFENDANT-INTERVENORS

Consolidated Court No. 93–03–00178

(Dated September 23, 1993)

*Galvin & Mlawski (John J. Galvin* and *Jack D. Mlawski)* for plaintiff.
*Lyn M. Schlitt,* General Counsel, *James A. Toupin,* Assistant General Counsel, *Katherine Jones,* Attorney Advisor, United States International Trade Commission; *Frank W. Hunger,* Assistant Attorney General, *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, United States Department of Justice *(Michael S. Kane), Robert E. Nielsen,* Senior Attorney, United States Department of Commerce, of counsel, for defendant.
*Siegel, Mandell & Davidson (Brian S. Goldstein* and *Paul A. Horowitz)* for defendant-intervenors Atul Products Ltd. and Biddle Sawyer Corporation.
*McNair & Sanford (Randi S. Field), Miller, Canfield, Paddock & Stone (William E. Perry)* for defendant-intervenors C.H. Patrick & Co., Inc., International Technical Services, Ltd., *et al.*

## OPINION

RESTANI, *Judge:* This case comes before the court upon a motion for preliminary injunction. Plaintiff Sandoz Chemicals Corporation ("Sandoz") seeks to enjoin the liquidation of entries of sulfur dyes from the United Kingdom, India and China pending resolution of its judicial challenge to the negative final injury determinations of the United States International Trade Commission ("ITC").

## BACKGROUND

On April 10, 1992, plaintiff filed a petition alleging dumping of sulfur dyes from the United Kingdom, India, and China. The United States Department of Commerce, International Trade Administration ("Commerce") found that sulfur dyes from the United Kingdom were being dumped in the United States at the rate of 19.97%. *Sulfur Dyes, Including Sulfur Vat Dyes, from the United Kingdom,* 58 Fed. Reg. 3253, 3259 (Dep't Comm. 1993) (final determ. of sales at less than fair value ("LTFV")). Dumping margins for Chinese manufacturers were found to be much higher—from 34.96% for one individual manufacturer to 213.16% for "all others." *Sulfur Dyes, Including Sulfur Vat Dyes, from the People's Republic of China,* 58 Fed. Reg. 7537, 7545 (Dep't Comm. 1993) (final determ. of LTFV sales). According to Commerce, critical circumstances existed for all but one of the Chinese manufacturers. *Id.* Rates for Indian manufacturers ranged from 2.75% to 17.55% and no critical circumstances were found to exist. *Sulfur Dyes, Including Sulfur Vat Dyes, from India,* 58 Fed. Reg. 11,835, 11,842 (Dep't Comm. 1993) (final determ. of LTFV sales).

ITC issued an affirmative preliminary determination of material injury in May 1992. *Sulfur Dyes from China, India, and the United Kingdom,* USITC Pub. 2514, Inv. Nos. 731–TA–548, 550, 551 (May 1992) (prelim. determ.). The period of investigation was 1989 through 1991. ITC noted overall increases over the period of investigation in production, capacity utilization, shipments and net sales, which would seem to indicate a lack of injury. General financial indicators, however, showed a decrease in profitability, operating income, net income and cash flow. *Id.* at 17–18. Based on these figures, ITC determined that a reasonable indication of material injury or threat of material injury was present. *Id.* at 1. It expressed a wish to examine more closely the product mix of sulfur dyes and the importance of price in purchasers' decisionmaking. *Id.* at 19.

After further investigation, ITC finally concluded that there was no material injury or threat of material injury by reason of LTFV imports, despite its affirmative preliminary determination. *Sulfur Dyes from China and the United Kingdom,* USITC Pub. 2602, Inv. Nos. 731–TA–548, 551, at 1 (Feb. 1993) (final determ.); *Sulfur Dyes from India,* USITC Pub. 2619, Inv. No. 731–TA–550, at 1 (Apr. 1993) (final determ.). ITC based its finding of no material injury on the lack of price suppression or depression, the importance of non-price factors such as environmentally safer products manufactured by importers and plaintiff, and the low level of imports as a percentage of domestic consumption. *Sulfur Dyes from China and the United Kingdom,* USITC Pub. 2602, at 18, 25, 28. ITC found no causal nexus between LTFV imports and any downturn in the industry. *Id.* at 30; *Sulfur Dyes from India,* USITC Pub. 2619, at 17. In ITC's view, plaintiff itself contributed to its drop in operating income by introducing a lower-priced product line that competed with its own more expensive goods. *Sulfur Dyes from India,* USITC Pub. 2619, at 12. ITC also found no threat of material injury to the domestic industry because the only two United States importers, C.H. Patrick and Southern Dye, were operating their finishing plants at full capacity and had no plans to expand.[1] *Id.* at 20; *Sulfur Dyes from China and the United Kingdom,* USITC Pub. 2602, at 32.

### DISCUSSION

Although this court has the power to enjoin liquidation of customs entries, this power is meant to be used only if the strict standards for injunctive relief are met. 19 U.S.C. § 1516a(c)(2) (1988); S. Rep. No. 249, 96th Cong., 1st Sess. 253 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 639. This court will not grant a motion for preliminary injunction unless plaintiff shows "(1) that it will be immediately and irreparably injured; (2) that there is a likelihood of success on the merits; (3) that the public interest would be better served by the relief requested; and (4) that the balance of hardship on all the parties favors the petitioner." *Zenith*

---

[1] Nearly all the imported sulfur dyes covered by the investigation were unfinished insoluble dyes, which required finishing by the importers. *Sulfur Dyes from China and the United Kingdom,* USITC Pub. 2602, at 6.

*Radio Corp. v. United States,* 1 Fed. Cir. (T) 74, 76, 710 F.2d 806, 809 (Fed. Cir. 1983). Plaintiff must satisfy each of the four factors, but if it makes a strong showing of irreparable injury it faces a lesser burden in proving likelihood of success on the merits, and *vice versa. American Air Parcel Forwarding Co. v. United States,* 1 CIT 293, 300, 515 F. Supp. 47, 53 (1981).

A. *Irreparable Injury:*

Liquidation alone may be considered irreparable injury in the context of judicial challenge to an administrative review of an antidumping order pursuant to § 751 of the Trade Agreements Act of 1979, *codified at* 19 U.S.C. § 1675 (1988). *Zenith,* 710 F.2d at 810.[2] An administrative review governs liquidation of entries made during a discrete time period and does not necessarily control liquidation of all future entries. *Timken Co. v. United States,* 11 CIT 504, 506, 666 F. Supp. 1558, 1559 (1987). Because the statute makes no provision for reliquidation after a successful judicial challenge, judicial review loses the greatest part of its effect once liquidation of the entries at issue occurs.[3] *Zenith,* 710 F.2d at 810. If liquidation is enjoined pending judicial resolution of a dispute, the statute provides for liquidation in accordance with the final court decision in the action. 19 U.S.C. § 1516a(e) (1988).

Unlike an annual review, a negative injury determination affects liquidation of all future entries, not just those made within a specific time period. *American Spring Wire Corp. v. United States,* 7 CIT 2, 5, 578 F. Supp. 1405, 1407 (1984). In such a situation, liquidation does not substantially curtail available judicial remedies. In the court's words,

> [t]he unique aspect of section 751 administrative reviews—their capacity for eluding judicial scrutiny because of their periodic nature—is simply not present here * * *. [N]egative injury determinations * * * will, as a practical matter, extend *in futuro,* unless upset by an intervening judicial decision. And should this court ultimately reverse the Commission's negative injury determinations, antidumping and countervailing duties can still be assessed at that time on all unliquidated as well as future entries pursuant to an affirmative injury determination.

*Id.* Therefore, in cases involving negative injury determinations, a party seeking a preliminary injunction must submit actual evidence of irreparable harm rather than relying on the mere fact of liquidation. *See Timken,* 11 CIT at 506, 666 F. Supp. at 1559–60 (in challenges to negative determinations by Commerce or ITC, liquidation alone is not sufficient to constitute irreparable harm); *Bomont Indus. v. United States,* 10 CIT 431, 435, 638 F. Supp. 1334, 1338 (1986) ("the *Zenith* decision did not create an irrebutable [sic] presumption of irreparable harm").

---

[2] A party may not rely solely on the *Zenith* test of irreparable harm in requesting a preliminary injunction. The party must also carry its burden of persuasion as to the remaining three factors. *See FMC Corp. v. United States,* No. 92–1366, at 13 (Fed. Cir. Aug. 19, 1993).

[3] There is a possibility of affecting future deposit rates even if all entries are liquidated. *See* 19 U.S.C. § 1673e(a)(3) (1988).

Irreparable harm is harm that is serious and irremediable. A mere possibility of future harm, no matter how great, will not support a request for a preliminary injunction; the threat must be present and existing. *Zenith,* 710 F.2d at 809 (citing *S.J. Stile Assocs. v. Snyder,* 68 CCPA 27, 30, C.A.D. 1261, 646 F.2d 522, 525 (1981)). Plaintiff cites three examples of what it considers to be irreparable harm: 1) "unfettered imports of product dumped at triple-digit margins," 2) forced price reductions to compete with imports, and 3) possibility of increased imports due to "an unlimited supply" from a United Kingdom exporter. Plaintiff's Memorandum in Support of its Motion for the Issuance of a Preliminary Injunction to Stay Liquidation, at 7 ("Plaintiff's Memorandum").

This court is unwilling to conclude that triple-digit dumping margins are, as plaintiff urges, *per se* irreparable injury, where ITC has found no material injury at all. *See Ipsco, Inc. v. United States,* 12 CIT 676, 684, 692 F. Supp. 1368, 1375 (1988) ("where no material injury to the domestic industry was found, the relationship between liquidation and injury to the moving domestic party may be even less apparent"). Financial data show that plaintiff has been performing better in the first nine months of 1992 than in the previous years covered in the period of investigation. *Sulfur Dyes from China and the United Kingdom,* USITC Pub. 2602, at 19–20. Production, net sales, productivity and wages were all higher in 1992 than in 1991. *Id.* Production and net sales also increased generally over the period of investigation. *Id.* Although operating income decreased during the period of investigation, operating income as a percentage of sales was higher in 1992 than in 1991. *Id.* at 20. These factors indicate that plaintiff is not experiencing difficulty competing in the marketplace. *Cf. Bomont,* 10 CIT at 435, 638 F. Supp. at 1338 (finding a net loss for one and a half out of two and a half years and a recent drop in sales to be evidence of plaintiff's difficulty in competing).

Plaintiff argues that data for the first nine months of 1992 are erroneous and should be discounted. Further, it contends that the initiation of the antidumping investigation or ITC's affirmative preliminary injury determination may have influenced the marketplace. Although there is some information that official import statistics for 1992 were tainted, ITC relied on questionnaire responses rather than official statistics.[4]

Plaintiff's second attempt to establish irreparable harm consists of an affidavit asserting that plaintiff offered to sell a shipment of dye to a customer at a 20% discount in response to the customer's threat to purchase a comparable product from C.H. Patrick, a major importer, if the discount was not given. Affidavit of Patrick Toomey, at 1. While evidence concerning the importers' competing prices may be considered in connection with a motion for preliminary injunction, the evidence must be

---

[4] The discrepancy in the official statistics is noted and explained in the confidential version of defendant-intervenors' brief. Defendant-Intervenors' Joint Response in Opposition to Plaintiff's Motion for the Issuance of a Preliminary Injunction to Stay Liquidation, at 3.

specific. Where plaintiff fails to submit price quotes or up-to-date pricing information, plaintiff's proof is inadequate. *See Bomont,* 10 CIT at 436, 638 F. Supp. at 1339. Although the customer asked for a 20% discount to prevent it from taking its business to C.H. Patrick, the customer's request does not constitute evidence that C.H. Patrick's prices are 20% lower than plaintiff's. Furthermore, one offer of sale at a 20% discount is not clear proof of a forced reduction in prices sufficient to harm plaintiff irreparably. *See Timken,* 11 CIT at 508, 666 F. Supp. at 1561 (the issue is not whether imports undersold plaintiff but whether imports threaten serious harm).

Plaintiff's final offer of proof is the information that C.H. Patrick had told domestic customers that its supply of dye from British sources was unlimited. Toomey Affidavit, at 2. The evidence of record would seem to dispute this. *See* Affidavit of Silvio Rodriguez, at 4; Affidavit of Robin Schofield, at 1. Nevertheless, plaintiff asserts that this information, combined with import statistics that indicate a 20% increase in imports in the first nine months of 1992, demonstrates irreparable harm. The fact that plaintiff's performance improved over the first nine months of 1992 despite the rise in imports indicates that imports are not causing irreparable harm. Plaintiff claims that further losses "would be devastating to Sandoz's overall volume budget and threaten the continued viability of Sandoz[ ]." Toomey Affidavit, at 2. Plaintiff cannot sustain its burden of proof by submitting vague and conclusory affidavits, and thus it has failed to satisfy the first prong of the test for granting a preliminary injunction. *See Tropicana Prods., Inc. v. United States,* 3 CIT 171, 175–76, *as amended by* 3 CIT 240 (1982).

## B. *Likelihood of Success on the Merits:*

Although the lack of evidence of irreparable harm is sufficient to defeat a motion for preliminary injunction, the court will also address the plaintiff's likelihood of success. A determination of material injury depends on the volume of imports, the impact on prices, and the state of the domestic industry. 19 U.S.C. § 1677(7)(B) (1988). A finding of threat of material injury, on the other hand, is based on such concerns as whether the exporting country has significant underutilized capacity to produce the merchandise under investigation. *Id.* § 1677(7)(F)(i)(VI). Plaintiff claims that ITC erred in each step of its analysis.

### 1. *Volume of Imports:*

Plaintiff accuses ITC of ignoring the fact that imports doubled between 1988 and 1989 and were virtually non-existent before 1988. Furthermore, the market share of imports jumped dramatically between 1989 and 1991 and continued to surge during the first nine months of 1992. As defendant points out, if imports doubled after a period in which they were virtually non-existent, the doubled volume would likely be quite small. In addition, despite the jump in market share that occurred between 1989 and 1991, at no time did imports account for more than

thirty percent of domestic consumption. *Sulfur Dyes from China and the United Kingdom,* USITC Pub. 2602, at 25.

Plaintiff bases its contention that imports surged in the first nine months of 1992 upon Commerce's finding of critical circumstances in certain Chinese imports. *Sulfur Dyes from the People's Republic of China,* 58 Fed. Reg. at 7545. Commerce will find critical circumstances if there have been massive imports within a short time period and either a history of dumping existed or the importer knew or should have known of the dumping. 19 U.S.C. § 1673d(a)(3) (1988). In contrast, when making a material injury determination, ITC examines the significance as well as the quantity and rate of importation. *Id.* § 1677(7)(C)(i). Viewed in the context of a market heavily dominated by domestic production, the import surge of 1992 does not necessitate a finding of material injury.

### 2. *Effect of Imports on Domestic Prices:*

Plaintiff's argument concerning price depression or suppression is unpersuasive. ITC is directed to search out evidence that underselling is lowering or creating a false ceiling on domestic prices, resulting in price depression or suppression. 19 U.S.C. § 1677(7)(C)(ii). ITC found that plaintiff's prices rose over the period of investigation, indicating a lack of price depression. *Sulfur Dyes from China and the United Kingdom,* USITC Pub. 2602, at 25.

Furthermore, plaintiff itself was the first to introduce a lower-priced line of sulfur black dyes, when it presented its Deniblack product in 1989. *Id.* at 29. C.H. Patrick introduced its own competing low-priced line in 1990. Plaintiff now argues that its lower-priced line was in reaction to C.H. Patrick's artificially low prices for the more expensive type of dye. Defendant contends that plaintiff might have begun the new line in an effort to attract new customers while continuing to charge higher prices to existing customers. ITC may rely on evidence that price reductions were seemingly initiated by plaintiff.

### 3. *Effect of Imports on the Domestic Industry:*

In examining the impact of imports on the domestic industry, ITC did not, as plaintiff alleges, base its conclusion primarily on the upward trends present in the first nine months of 1992, after the period of investigation ended. ITC stressed the gain in net sales over the entire period of investigation and the increase in market share in 1991 and in 1992. *Sulfur Dyes from China and the United Kingdom,* USITC Pub. 2602, at 30. Based on non-price factors such as fashion effects of certain dyes and availability of environmentally safer dyes, the final determination also found no causal link between imports and injuries. *Id.* at 17–18, 30.[5] An assessment of the three statutory factors of volume, price, and state of

---

[5] Both the preliminary and the final determinations found some factors indicating upward trends in the domestic industry and others indicating downward trends. The preliminary determination did not address the issue of causation, but it did express a desire to investigate the importance of price on purchasers' decisionmaking and the effect of the availability of environmentally safer dyes. *Sulfur Dyes from China, India, and the United Kingdom,* USITC Pub. 2514, at 19.

the domestic industry leads to the conclusion that plaintiff will likely not prevail on its challenge to ITC's finding of no material injury.

### 4. *Threat of Material Injury:*

ITC also found no threat of material injury. *Sulfur Dyes from China and the United Kingdom,* USITC Pub. 2602, at 31. Plaintiff argues that ITC incorrectly determined that there is no underutilized or excess capacity in the exporting countries, an element of threat of material injury under 19 U.S.C. § 1677(7)(F)(i)(VI). ITC found that a bottleneck effect limited imports because "the only two significant importers of the subject dyes, Southern Dye and C.H. Patrick[,] are currently operating at close to full capacity and have no plans to increase their imports." *Sulfur Dyes from China and the United Kingdom,* USITC Pub. 2602, at 32.

Plaintiff contends that C.H. Patrick submitted no information to ITC concerning the importer's capacity and its ability to expand. Defendant-intervenors' brief and accompanying affidavits make it clear that several detailed confidential submissions were made to ITC. These submissions constitute substantial evidence supporting ITC's finding that an importing bottleneck exists. Moreover, plans to expand are not a clear indication of threatened material injury. Expansion takes time and domestic demand for the product may increase in the interim. *See Alberta Gas Chems., Inc. v. United States,* 1 CIT 312, 323–24, 515 F. Supp. 780, 790–91 (1981) (finding no threat of material injury despite plaintiff's serious consideration of expansion plans). To satisfy the statute, a threat of material injury must be real and imminent rather than conjectural. *Id.* at 323, 515 F. Supp. at 790 (quoting S. Rep. No. 249, 96th Cong., 1st Sess. 88–89 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 474–75). Plaintiff's arguments amount to nothing more than supposition.[6] In short, plaintiff also fails to satisfy the second prong of the test for preliminary injunction, that of likely success on the merits.

Because plaintiff cannot satisfy the first two critical prongs of the test, the court deems it unnecessary to discuss the remaining prongs of public interest and balance of hardships. Plaintiff's motion for preliminary injunction is denied.

---

[6] Plaintiff asserts two additional arguments, which are unavailing. First, it argues that ITC has a duty to determine whether the domestic industry would have been injured but for the initiation of the investigation or the issuance of an affirmative preliminary determination. This assumes that imports would drop off after the start of the investigation commenced. As indicated, imports actually increased after the investigation began. Second, plaintiff asserts that ITC based its determination on the absence of continuing injury without considering the lingering effects of past injury. It argues that continuing effects of past injury should constitute present injury under the statute. *But see Norwegian Salmon A/S v. United States,* Slip Op. 92–196 (Oct. 23, 1992), *appeal dismissed,* Nos. 93–1148, 93–1235 (Fed. Cir. June 15, 1993). Plaintiff's legal arguments are irrelevant for the simple reason that ITC clearly found no material injury. *Sulfur Dyes from China and the United Kingdom,* USITC Pub. 2602, at 1; *Sulfur Dyes from India,* USITC Pub. 2619, at 1.